UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CARLOS BAYON,                                                98-CV-0578E(Sr)
                        Plaintiff,

            -vs-                                               MEMORANDUM

THE STATE UNIVERSITY OF NEW YORK AT                                    and
  BUFFALO,
                        Defendant.                              ORDER[1]

---

## INTRODUCTION

Plaintiff Carlos Bayon ("Bayon") commenced this action alleging, *inter alia*, that

the University at Buffalo ("UB") unlawfully retaliated against him in violation of Title

V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a).[2]  The trial

commenced on May 2, 2005 and the jury returned a verdict in Bayon's favor on May

5, 2005, awarding him $601,000 in damages.  Pending before the Court are UB's

renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil

Procedure ("FRCvP") 50(b)[3] and its Motion for a New Trial pursuant to FRCvP 59.

---

[1] This decision may be cited in whole or in any part.

[2] Bayon's other claims for unlawful intentional discrimination in violation of Title II of the ADA and Title VI of the Civil Rights Act were dismissed on UB's motion for summary judgment. *See Bayon* v. *State University of New York at Buffalo*, 2004 WL 625133 (W.D.N.Y. 2004) (Elfvin, J.).

[3] UB made a Motion for Judgment as a Matter of Law pursuant to FRCvP 50(a) at the close of Bayon's case and at the close of all evidence.  The Court reserved decision at both times.

BACKGROUND

At trial, the Court heard testimony from Bayon, Dr. Ann McElroy ("McElroy"), Bayon's academic adviser for the Fall 1997 semester, Dr. Christine Duggleby ("Duggleby"), the former Director of Graduate Students for the Anthropology Department, Joanne Plunkett ("Plunkett"), a Financial Aid Department employee, Dr. Milisauskas ("Milisauskas"), the former Chairman of the Anthropology Department, Dr. Maurizio Trevisan ("Trevisan"), Chairman of the Social and Preventative Medicine Department, Linda Draper ("Draper"), Bayon's good friend and landlord, Dr. Monroe Eagles, Dr. David Triggle ("Triggle"), Dean of the Graduate School, Dr. Donald Pollock ("Pollock"), the current Chairman of the Anthropology Department and Mary Anne Lang, the Secretary to the Anthropology Department.  Based on the testimony and the exhibits introduced into evidence, the jury could have found the following facts.

Bayon completed his Bachelor's Degree at UB in June 1996.  He thereafter commenced studies as a graduate student in the Anthropology Department in order to pursue a Master's Degree and eventually a Ph. D.  While Bayon performed acceptably during the Fall 1996 semester, he received grades including a "C" and a "D" in the Spring 1997 semester and, as a result, his cumulative grade point average

("GPA") fell below a 3.0.[4]  (T[5] at 12-14.)  He also failed the physical anthropology qualifying examination in May 1997.[6]

Thereafter, Bayon filed complaints with the United States Department of Education's Office of Civil Rights and requested that UB's Anthropology faculty retroactively withdraw him from the two classes in which he had performed poorly.[7] (T at 14- 17.)  Bayon also requested that he be assigned a new academic advisor and that he be allowed to change his subfield concentration from physical anthropology to cultural anthropology.  (T at 19-20.)  Bayon's request to change his subfield concentration was granted and Bayon began his studies in the Fall 1997 semester in the cultural anthropology subfield with Dr. Ann McElroy as his academic advisor.  (T at 20-23.)  Among other classes, Bayon enrolled in an Introduction to Epidemiology

---

[4] The undisputed testimony is that UB's Graduate School requires that all graduate students maintain a cumulative GPA of 3.0 or greater.  A 3.0 equates to a "B" average.

[5] The parties had the testimony of certain witnesses transcribed.  The transcripts were separately paginated.  Therefore, the Court will refer to the transcript of proceedings held on May 2, 2005 as "T," the transcript of proceedings held on May 3, 2005 as "T2" and the transcript of proceedings held on May 4, 2005 as "T3."

[6] A further result of Bayon's substandard performance in the Spring 1997 semester was that his current advisor recommended that he withdraw from the classes he intended to take and the research he intended to perform over the Summer of 1997.

[7] Duggleby responded that she could not retroactively withdraw him, that there was a procedure for Bayon to follow in order to obtain that relief and Duggleby provided Bayon with a written copy of said procedure.  While Bayon testified that, in accordance with the procedure, he approached the relevant professors to obtain their consent for his withdrawal and that they were "reluctant" to assist him, there was no evidence presented that Bayon followed the remainder of the procedure or that he made any further inquiry with the Anthropology Department to appeal from the professors' alleged refusal to assist him or that he made any further attempt to retroactively withdraw from those classes.  At the time of trial, the "C" and "D" grades still appeared on Bayon's official transcript.  (T at 16-18.)

class offered through the Social and Preventative Medicine Department ("SPM 501")

at McElroy's suggestion. (T at 30-31.) Because Bayon's GPA was below the required

3.0 level, Bayon was denied financial aid for the Fall 1997 semester but was

financially able to register for and attend classes during the Fall 1997 semester

because, as a recipient of the Schomberg Fellowship, he received a full tuition

waiver.[8] (T at 27-30.) Bayon was not placed on academic probation for that semester,

however, because it was his first semester in the cultural anthropology subfield and

Duggleby wanted to provide him with an opportunity to improve his academic

standing.[9]

By September 1997, many Anthropology professors were aware that Bayon had

filed complaints with the Office of Civil Rights. McElroy was also aware of the

complaints because Bayon had told her about them over the Summer of 1997 prior to

her agreement to become his academic advisor.[10] (T at 21, 138.) McElroy and Bayon

scheduled an advisement meeting to be held in September 1997. (T at 21.) Prior to

---

[8] Although his tuition was waived as a benefit of his fellowship, Bayon required financial aid, which typically consisted of loans, in order to pay fees not covered by his tuition waiver — *i.e.*, student fees and student medical insurance premiums. As a result of being denied financial aid for the Fall 1997 semester, Bayon was unable to pay the student fees and insurance premiums, resulting in a balance due UB of approximately $950. (T at 29-30.)

[9] Duggleby testified that students were not automatically placed on academic probation when their GPAs fell below a 3.0 and that she had some discretion to determine whether or not a student should be placed on probation.

[10] McElroy testified at trial that she was unaware that the complaints had been filed with the Office of Civil Rights specifically and that, at the time, she thought Bayon had just filed a grievance within the university. Nonetheless, McElroy was aware that Bayon had made complaints.

the meeting, McElroy briefly discussed the subject of Bayon's complaints with Dr. Steegman, Bayon's former academic advisor.  (T at 142-43.)  McElroy also briefly discussed with Milisauskas, the Chairman of the Anthropology Department, the fact that Bayon had filed such complaints.   (T at 143-44.)  In the discussion with Milisauskas, McElroy told him that she intended to ask Bayon to drop his complaints and Milisauskas responded that it would do no good to ask.  (T at 144-45.)  At the advisement meeting, McElroy in fact asked Bayon to drop his complaints, telling him that professors in the department were upset and distressed about his complaints and that if he wanted to graduate he should drop the complaints.  (T at 23-26.)  Bayon refused.  McElroy continued to advise Bayon on his academic endeavors through the Fall 1997 semester and into the Spring 1998 semester.[11]

In October or November of 1997, Bayon inquired of the Financial Aid Department as to whether his financial aid could be reinstated.  (T at 27-28.)  He was informed by Joanne Plunkett that, if the Anthropology Department would certify that he was making satisfactory academic progress, he could still receive financial aid for Fall 1997 even though the semester had already begun.  (T at 28-29.)  Plunkett inquired of the Anthropology Department as to whether Bayon could be certified as making such progress.  In response, Duggleby informed Plunkett that Bayon had switched his subfield concentration to cultural anthropology and, at the time of her

---

[11] Nevertheless, in September 1997 Bayon filed an additional complaint with the United States Department of Education, Office of Civil Rights, alleging, in part, that Dr. McElroy had threatened him.  (T at 81.)

response, Duggleby could not make a determination as to whether Bayon was making satisfactory academic progress.  (T at 29.)

Also during the Fall 1997 semester — specifically October 1997 —, Bayon continued to have academic difficulties, particularly in SPM 501 and with the professor for the class, Dr. Freudenheim ("Freudenheim").  (T at 30-31.)  After Bayon failed an examination in the class, he sent a complaint on October 14, 1997 to Dr. Trevisan, the Chairman of the Social and Preventative Medicine Department, requesting Trevisan's intervention and a meeting with Trevisan, Dr. Vena, the Director of Graduate Students for the Social and Preventative Medicine Department, and with Freudenheim, in order to resolve his issues with Freudenheim and the SPM 501 class.[12]  (T at 31-32.)  The meeting took place on October 17, 1997 with Bayon, Trevisan, Vena and Bayon's friend, Linda Draper — who was also a complaining student in the class — in attendance.  (T at 33-35.)  Freudenheim was not present. Both Bayon and Draper testified that Trevisan was loud, angry and aggressive toward Bayon at the meeting.  (T at 36; T3 at 6.)  As a result of the meeting, Draper was advised to discuss her concerns about her examination grade directly with Freudenheim. (T3 at 7-8.)  Bayon, however, was told that an investigation into his

---

[12] Bayon alleged that Freudenheim was biased against him, that she would not assist him with his efforts in the class, that she had refused to answer his questions on multiple occasions while answering the questions of others and, with respect to the examination Bayon had failed, that she had poorly constructed the examination and had unfairly graded him.  After filing his complaint, Bayon ceased attending SPM 501.  (T3 at 16.)

allegations concerning Freudenheim's conduct toward him would be commenced and that his examination would be reviewed by a graduate committee.  (T at 36.  T3 at 7.)

Bayon was concerned that he receive a response to his complaint — particularly a resolution of the grading of his examination — prior to October 24, 1997 because such date was the last on which he could withdraw from the class.  (T at 37-38.)  Both Bayon and Draper testified that the upcoming deadline for withdrawal from the class was discussed with Trevisan at the meeting.  (T3 at 7.)  Bayon testified that Vena said not to worry about the deadline because he was going on vacation and was unsure how long his investigation into Bayon's complaints would take.  (T at 37-38.)  In contrast, Draper testified that it was Trevisan who acknowledged the deadline and stated that he would look into Bayon's allegations quickly so that Bayon could decide whether or not to withdraw from the class.  (T3 at 7.)  The graduate committee met on November 3, 1997 at which time the committee awarded Bayon an additional five points on his examination, but such additional points were insufficient to raise Bayon's score to a passing grade.[13]  (T at 38-39.)  Thereafter, Bayon advised

---

[13] There was some evidence presented during the testimony of Duggleby and Trevisan — which was not transcribed — that, at some point prior to the graduate committee's determination regarding Bayon's grade on the SPM 501 examination, Duggleby on behalf of the Anthropology Department solicited the Social and Preventative Medicine Department for a report on Bayon's academic progress in that class.  The implication was that Duggleby's request somehow intimated to Trevisan that any determination should not be favorable to Bayon.  However, any inference of retaliation by Trevisan, Vena or the Social and Preventative Medicine Department motivated by Bayon's complaints to the Office of Civil Rights regarding the Anthropology Department faculty is very weak.  It is unclear as to whether Bayon made similar complaints to the Office of Civil Rights regarding Freudenheim and — if such complaints were
(continued...)

Vena that he wanted to withdraw from the class. (T at 40.) Trevisan — not Vena —

responded to Bayon's request, noting that the deadline to withdraw had passed and

that Bayon should pursue the academic requirements for successful completion of the

class.[14] (T at 41-42.) As noted earlier, after filing his complaint, Bayon did not attend

classes or perform any of the academic requirements for SPM 501. (T3 at 16-17.) He

ultimately received a grade of "F" for SPM 501 and his GPA remained below the

required 3.0 average. (T at 44-45.)

Registration for the Spring 1998 semester began in November 1997. At that

time, Bayon owed UB approximately $950 in unpaid student fees and insurance

premiums. As a result of the unpaid balance, a "check-stop" was issued against his

account which prevented him from registering until he paid the balance due. (T at

84-85.) At the time Spring 1998 registration commenced, there was no academic

impediment to Bayon's registration, only the "check stop" due to his outstanding

---

[13](...continued)
made — whether the complaints were made before or after Trevisan's and Vena's investigation was complete.

[14] In response to Trevisan's suggestion that Bayon complete the academic requirements for SPM 501, Bayon sent Trevisan a letter arguing that because Trevisan ordered an investigation of Bayon's complaints regarding Freudenheim and had arranged for his examination to be reviewed by a graduate committee, the deadline for Bayon to withdraw from the class had been extended because the deadline should not be enforced while the investigation was ongoing. (T at 43.) This letter contrasts markedly with Bayon's and Draper's testimony at trial that Vena or Trevisan explicitly told Bayon that he need not worry about the deadline. It seems that, had such an explicit representation been made by Vena or Trevisan in that meeting, Bayon would have reminded Trevisan of that representation. The jury, however, may have fully credited Bayon's and Draper's testimony that such a representation was made.

balance.  Notwithstanding the balance due, Bayon was informed in January 1998 that he could register late for the Spring 1998 semester — which had already commenced — if he agreed to immediately pay one-half of his balance and agreed to pay the other half by April 1, 1998.  (T at 86.)  Bayon did not pay any of the outstanding balance and therefore was unable to register.  *Ibid*.  Bayon did not register for or attend any classes for the Spring 1998 semester.

Early in 1998 Bayon sought the assistance of Madison Boyce, the UB Ombudsman, in order to be retroactively withdrawn from SPM 501.  (T at 46.)  Because Bayon's GPA for the Fall 1997 semester fell below 3.0, on February 11, 1998 Duggleby sent Bayon a letter advising him that he was placed on academic probation for the Spring 1998 semester.  (T at 45.)  At that time, however, Bayon was not a registered student because he had failed to register for any classes.  (T at  45-46.)  Thereafter, on February 23, 1998 Bayon was retroactively withdrawn from SPM 501, his cumulative GPA rose above 3.0 and his academic probation was removed.  (T at 46-47.)

After he had been retroactively withdrawn from SPM 501, Bayon sought to register late for the Spring 1998 semester and have his financial aid and fellowship reinstated.  (T at 49.)  On March 2, 1998 Bayon wrote to Triggle requesting that Triggle register him for two classes.  (T at 49-50.)  On March 20, 1998 Triggle denied Bayon's request because the semester had begun on January 20 and because Bayon had not been attending the classes for which he sought to register.  (T at 50-51.)

After his request to register late was denied, Bayon filed for a Waiver of Continuous Registration requirement.   That waiver was denied by Duggleby because only registered students are eligible for such a waiver under UB policy. (T at 52-54.)  Next, Bayon filed for a leave of absence for the Spring 1998 semester, which was also denied.  (T at 54-55.)

In August 1998, Bayon sought readmission to the Anthropology Department.[15] (T at 55-56.)   A graduate committee was convened in order to consider Bayon's application.  (T3 at 41.)  During the discussion of his application, Duggleby brought to the committee's attention that the "R" grade reflected on Bayon's official transcript for the SPM 501 class in Fall 1997 had previously been an "F".   (T3 at 46.)   Dr. Shryock, another member of the graduate committee who had taught Bayon in Fall 1996 and had given Bayon a grade of "B," indicated that — looking back — he would have given Bayon a "D".  (T3 at 44.)   In September 1998, the graduate committee rejected Bayon's application for readmission citing his failure of the qualifying examination in physical anthropology in Spring 1997, his poor performance in certain anthropology courses and the fact that his cumulative GPA of 3.1 was barely above the required 3.0. (T3 at 47.)  In March 1999 Bayon applied for a Waiver of Satisfactory Academic Progress. (T3 at 80.)  He was afforded an opportunity to supply additional

---

[15] Although Bayon had not been dismissed from UB or from the Anthropology Department at that time, he had to apply for readmission to the graduate program because by failing to register for the Spring 1998 semester, Bayon had not complied with UB policy that all graduate students be continuously registered for the duration of their graduate studies.  (T at 52.)

information pertinent to his application, but did not submit such.  (T3 at 81-82.)

Bayon's application for the waiver was likewise denied in April 1999 because the

graduate committee found no documentation or information supporting a finding of

extenuating circumstances sufficient to justify a waiver.  (T3 at 83.)  Bayon never

returned to his studies at UB.

<u>DISCUSSION</u>

UB argues that it is entitled to judgment as a matter of law pursuant to FRCvP

50(b) because Bayon failed to prove that UB's stated reasons for its actions were

pretext and that the real reason was retaliation and because the evidence was

insufficient to support any award for emotional distress damages.  As an alternative

to its FRCvP 50(b) Motion, UB argues that the verdict must be reversed and a new

trial ordered pursuant to FRCvP 59 because: (1) the Court's instruction to the jury

erroneously stated that UB would be liable if retaliation was a motivating factor in its

decision while the verdict sheet properly instructed the jury to find UB liable if

retaliation was the determining factor in its decision; (2) the Court failed to instruct

the jury on the requirement that Bayon mitigate his damages; and (3) the jury's

award of $601,000 is excessive and must be reduced or a new trial ordered.

Bayon opposes both Motions and argues that the evidence was sufficient to

support the jury's verdict on liability and the award of damages.  Bayon asserts that

the Court's instructions to the jury on the standard for retaliation claims was correct

and, even if incorrect, the instructions as a whole adequately reflected the proper

standard such that any error was harmless.  Bayon further asserts that because he presented no evidence of economic damages to which his obligation to mitigate would have applied, the Court's failure to so instruct the jury was not error and — if error — was harmless.  Finally, Bayon contends that the evidence was sufficient to support the verdict and the amount of damages such that neither a reduction of the award nor a new trial is required.

For the reasons that follow, UB's Motion for Judgment as a Matter of Law will be denied and UB's Motion for a New Trial will likewise be denied on the condition that Bayon accept a substantial remittitur of the damages award.

A.     Requirements for Judgment as a Matter of Law and for New Trial

Judgment as a matter of law may be granted against a party concerning "a claim or defense that cannot *** be maintained or defeated without a favorable finding" on an issue for which "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  FRCvP 50(a)(1).  When the Court does not grant such a motion made at the close of all evidence, it is said to have "submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  FRCvP 50(b).  The moving party is then permitted to renew its motion and — if it so chooses — join it with a motion for a new trial pursuant to FRCvP 59 within ten days after the entry of judgment.  *Ibid*.

When made after the jury has returned its verdict, a motion for judgment as a matter of law "may only be granted if there exists such a complete absence of

evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture or [if] the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Fairbrother* v. *Morrison*, 412 F.3d 39, 50 (2d Cir. 2005) (internal citations and quotations omitted).

Such motion should be granted, however, "only if the court can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Ibid*.  In making these determinations, "the court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or [otherwise] substitute its judgment for that of the jury." *Ibid*.

A new trial, on the other hand, may be granted pursuant to FRCvP 59, "if [the Court] is convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *United States* v. *Landau*, 155 F.3d 93, 104 (2d Cir. 1998). When considering a FRCvP 59 motion, the Court undertakes the same analysis as on a motion for judgment as a matter of law pursuant to FRCvP 50, but the standard for granting a FRCvP 59 motion is less stringent.  *Katara* v. *D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987).  The Court is also free to weigh conflicting evidence and is not required to view such evidence in favor of the non-moving party. *Song* v. *Ives Lab., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).

1.    <u>Sufficiency of the Evidence on Liability</u>

UB argues that it is entitled to judgment as a matter of law because Bayon failed to sustain his burden of proving, by a preponderance of the evidence, that UB's legitimate, non-retaliatory reasons were pretext and that retaliation was the determining factor in UB's decisions with regard to Bayon's academic status.

As noted, Bayon first filed complaints about the UB Anthropology faculty in June 1997.  Thereafter, the UB faculty took various actions that were adverse to him. UB argued that each such action was taken, not for retaliatory purposes, but for valid academic and administrative reasons.   The jury reasonably could have found, however, that Bayon's complaints were well-known among the Anthropology faculty, that the faculty members were angry and upset about the complaints and that, with the knowledge of the Chairman of the Anthropology department, McElroy told Bayon that he would not graduate from the department unless he dropped his complaints of discrimination.  Although several months had passed between Bayon's filing of his complaints and Duggleby's failure to certify in the Fall of 1997 that Bayon was making satisfactory academic progress, the jury could have concluded that such presented the first opportunity for any adverse action against Bayon and that such action had its intended effect of denying Bayon financial aid for that semester.[16]

_____

[16] Although the argument could be made that Duggleby would have placed Bayon on academic probation in Fall 1997 if her motive was truly retaliatory, McElroy testified that even if Bayon had been placed on academic probation at that time, he would not have been prevented from registering for the Spring 1998 semester. Thus, Duggleby's act of refusing to certify Bayon
(continued...)

Furthermore, the jury could have concluded that Duggleby's and Shyrock's comments at the graduate committee meeting at which Bayon's application for readmission was considered were not intended to convey a full picture of Bayon's academic performance, but rather, were retaliatory.

In short, the evidence was sufficient to justify the jury's determination that UB's stated reasons for its actions were not its true reasons and that, more likely than not, retaliation was the true reason for some or all of UB's actions.

2.    Erroneous Jury Instructions

UB argues that the Court erred in instructing the jury.  "Where the court's instruction misleads the jury as to the correct legal standard or where it fails to adequately inform the jury on the law, it will be deemed erroneous."  *Gordon* v. *New York City Bd. of Educ.*, 232 F.3d 111, 115 (2d Cir. 2000).  An erroneous legal instruction requires reversal unless the error was harmless.  *Ibid*.  An error is harmless only if "it did not influence the jury's verdict."  *Id*. at 115-16.  "An instruction that improperly instructs the jury on whether the plaintiff has satisfied [his] burden of proof is generally not harmless because it strikes directly at a plaintiff's claim."  *Sanders* v. *New York City Human Res. Admin.*, 361 F.3d 749, 758 (2d Cir. 2004) (citation omitted).  UB cites as error the Court's instruction to the jury that Bayon

---

[16](...continued)
as making satisfactory academic progress was more detrimental to Bayon because it resulted in his ineligibility for financial aid, a result of which was that he was unable to pay the $950 in student fees and insurance for Fall 1997 and which non-payment ultimately prevented him from registering for classes in Spring 1998.

should prevail if retaliation was the determining or motivating factor in UB's decisions.  UB contends that the term "motivating factor" was improper and that its use, coupled with the use of only the term "determining factor" in the special verdict sheet was prejudicial to UB and confusing to the jury.  UB also assigns as error the Court's failure to instruct the jury as to Bayon's duty to mitigate his damages despite ruling prior to issuing its instructions that such a charge would be included.  The Court examines each contention in turn.

a.      Determining Factor vs. Motivating Factor

UB asserts that the Court erred when it instructed the jury that it could find for Bayon upon deciding that retaliation was a determining or motivating factor in UB's decision.  UB argues that the correct standard is whether retaliation was the *determining factor* in its decisions and that the Court's failure to so instruct the jury, coupled with the inclusion of the determining factor language in the verdict sheet, was fatally confusing for the jury and therefore a new trial is warranted.[17]

The Court has reviewed the recording of its instructions to the jury.  The Court instructed the jury as follows:

> "In order to establish a causal link between the protected activity and the adverse action, Mr. Bayon has the burden of proving by a preponderance of the evidence, * * * that the University's non-retaliatory reasons for taking the adverse actions were false and that retaliatory

_____

[17] UB asserts that the instructions as given impermissibly combined the language for pretext cases and that for mixed-motive cases.

motives were a determining or motivating factor for its actions, but it need not be the sole reason for the University's actions.

\*      \*      \*      \*      \*

The University, however, asserts there were legitimate academic and administrative reasons for each and every decision that was adverse to him. The parties dispute the fourth element, namely whether there was a causal connection between his complaints to the Office of Civil Rights in June of 1997 and the University's adverse actions toward him. If you find that Mr. Bayon has satisfied his burden of proof for each of these elements, your verdict would be for Mr. Bayon. On the other hand, if Mr. Bayon has failed to prove any of these elements, your verdict would be for the University."

(Recording of Court's Instructions to the Jury on May 5, 2005 ("Recording") at 1:05:26 to 1:07:50.

After the Court had instructed the jury, it inquired as to whether either attorney had any exception to the instructions as given. UB noted that it did have an objection but opted to elaborate on it after the Court instructed the jury to begin its deliberations and after the jury had left the courtroom and retired to deliberate. (Recording at 1:16:53 to 1:21:02.) Upon the Court's inquiry as to whether the jury needed to be recalled and a curative instruction issued, UB agreed that, so long as the Court's instructions had not been physically provided to the jury for its use during its deliberations, the fact that the jury sheet contained the proper instruction negated any need to recall and further instruct the jury.

The Court cannot conclude that its inclusion of the term "motivating" with the term "determining factor" rendered the instructions as a whole incorrect or

misleading.  In a pretext case, such as this, the plaintiff is obligated to prove, by a preponderance of the evidence, that the defendant took the adverse actions because of retaliation.  Here, in addition to finding that retaliation was the determining factor in UB's decisions with respect to Bayon, the jury also found that UB had no legitimate, non-discriminatory reason for its actions — in other words, the jury did not believe the reasons propounded by UB for taking the adverse actions against Bayon.  The Court's inadvertent inclusion of "motivating factor" in the instructions, when considered in light of the fact that "determining factor" was also used in the instructions and was used exclusively in the special verdict sheet, renders any error harmless.

b.    <u>Mitigating Damages</u>

UB also asserts that the Court erred in failing to instruct the jury as to Bayon's duty to have mitigated his damages because Bayon claimed lost economic opportunity resulting from his inability to complete his degree due to UB's unlawful retaliation.  UB contends that the Court had ruled —  prior to issuing its instructions — that the mitigation charge was appropriate, yet failed to include such charge in the instructions issued to the jury.[18]  Bayon argues that he had no duty to mitigate damages — and thus no instruction was required — because the damages he sought were based on emotional distress not economic harm.  Alternatively, Bayon argues

_____

[18] While UB made its position clear prior to the Court's instructions to the jury, UB failed to object after the charge was read and did not alert the Court to its failure to so instruct the jury.

that the jury likely took mitigation into consideration despite the lack of an instruction.[19]

"Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate. This may be done by establishing that suitable work existed and that the employee did not make reasonable efforts to obtain it." *Broadnax* v. *City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (internal citation and quotation marks omitted). The employer need not show the availability of other employment if it can demonstrate that the employee made no reasonable efforts to seek employment. *See ibid*. Here, however, no evidence was introduced as to any wages Bayon may have lost. As is discussed in more detail *infra*, the only evidence as to any economic damages Bayon may have suffered is that he still owes over $100,000 in student loans. While Bayon testified that, absent UB's retaliatory actions, he believed he would have achieved his Master's Degree and his Ph. D., and that he intended to teach at the collegiate level, there was no testimony as to what wages he could have or would have earned had he accomplished those goals. Therefore, the Court concludes that there was no error

---

[19] Such an argument should be rejected out of hand because the Court will not presume that the jury considered matters or applied legal standards on which the Court did not instruct. The Court presumes that the jury followed the legal instructions provided.

in failing to instruct the jury as to mitigation of damages because Bayon presented no evidence of the type of damages to which the duty to mitigate should apply.[20]

3.   Sufficiency of the Evidence as to Damages

The jury awarded Bayon $601,000 in damages.  UB argues that the evidence was insufficient, as a matter of law, to support any amount of damages or, in the alternative, if supported, the amount must be reduced or a new trial ordered.  Bayon contends that his and Linda Draper's testimony is legally sufficient to support an award of emotional distress damages and that the amount awarded is appropriate such that no remittitur or new trial is warranted.  Bayon contends that he presented no evidence of economic damages and thus, the entire award is properly characterized as emotional distress damages.

In order to be awarded emotional distress damages, a plaintiff must show that he suffered an actual injury.  *See Carey* v. *Piphus*, 435 U.S. 247, 263-64 (1978).  A plaintiff's subjective testimony, standing alone, is insufficient to sustain an award of emotional distress damages.  *Patrolmen's Benevolent Ass'n* v. *City of New York*, 310 F.3d 43, 55 (2d Cir. 2002).  Rather, such evidence must be substantiated by other evidence, such as the testimony of witnesses to the plaintiff's distress.  *Ibid*.  A jury's award of damages may be set aside, reduced or a new trial awarded if the amount "shock[s] the judicial conscience and constitute[s] a denial of justice."  *O'Neill* v.

---

[20] UB does not contend that Bayon had a duty to mitigate his emotional distress damages.

*Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988).  In the event a verdict is determined to be excessive, the Court may order a new trial or, "condition a denial of a motion for new trial on the plaintiff's accepting damages in a reduced amount."  *Tingley Sys., Inc.* v. *Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).

Bayon and Draper testified as to Bayon's emotional distress.  Bayon stated that:

> "Well, it[']s - - it[']s been very difficult.  Many of the things, many of the problems sleeping, depression, a lack of - - somehow a lack of confidence to some extent, because I did not expect that this - - you know, I didn't think that these people have the power to do this, you know, under these circumstances.  It's been devastating, that's how I can put it, to me."

(T at 63.)  He also described UB's retaliation as "shocking" and that, as a result, he has been "depressed" and "not the way [he] used to be."  (T at 58.)

Draper corroborated Bayon's claim of emotional distress.  She testified that she first met Bayon in September 1997 when they both were students and would see him approximately two or three times a week.  (T3 at 9.)  She began "renting" him a room in her home in 1998.[21]  (T3 at 9, 19.)  She described him in 1997 as "a very happy, excited person looking forward to completing his degree."  (T3 at 10.)  She testified that as a result of his difficulties with the UB faculty, Bayon became anxious and lethargic.  (T3 at 11.)  His sleep patterns were disrupted and he slept for long periods

---

[21] Draper testified that Bayon "rented" a room in her home beginning at that time but, until he began receiving disability insurance payments in or about September 2004, Bayon paid no money for rent, utilities, food or other daily requirements with the understanding that when he received some money, he would pay what he was able. (T3 at 20-27.)

of time.  *Ibid*.  Bayon would engage in eating binges[22] and became more physically

disabled.  *Ibid*.

Some of Bayon's and Draper's testimony, however, conflicted.  Bayon testified

that he did not seek any medical assistance for any physical problems or emotional

stresses he experienced because he did not have health insurance until September

2004.  (T. at 63.)  He clearly stated that he had not been able to see any doctors —

even for his other physical problems — because he was uninsured.  *Ibid*.  Draper, on

the other hand, testified that she had taken Bayon to the hospital once in 1998 or 1999

and again in 2004 and that she had taken Bayon to doctor's appointments on several

occasions for problems relating to his back.  (T3 at 31-33, 33-36.)  Also, while Draper

indicated that Bayon had been prescribed a medication to treat anxiety three or four

months prior to trial, Bayon never indicated that he had sought medical treatment for

anxiety or had been prescribed any medication for anxiety.  (T3 at 13.)

The evidence presented is sufficient to establish that Bayon suffered some

emotional distress injury.  Therefore, to the extent UB seeks judgment as a matter of

law that Bayon is entitled to no damages, the motion will be denied.

UB also argues, in the alternative, that the jury's award is excessive and must

be reduced or a new trial ordered.  UB suggests that an award of no more than

$20,000 is appropriate in this case.  As an initial matter — one which was raised by

---

[22] No evidence was presented of any weight gain or loss — a commonly cited physical manifestation of emotional distress.

UB only in its reply memorandum but one the Court must address nonetheless — the Court must consider the applicability of the damages cap set forth in 42 U.S.C. §1981a. *See Muller* v. *Costello*, 997 F. Supp. 299, 302-03 (N.D.N.Y. 1998), *aff'd*, 187 F.3d 298 (2d Cir. 1999) (concluding that damages awarded pursuant to ADA claims of retaliation are subject to the statutory damages cap set forth at 42 U.S.C. §1981a). That section places limits on the amount of damages awards, which limits vary depending on the number of persons employed by the responding party.  As respects employers of more than 500 persons, awards of compensatory damages[23] are limited to $300,000.  In his opposition to the instant Motions, Bayon notes that the Court precluded him from introducing expert testimony concerning the amounts he could have earned had he achieved his Ph.D. and obtained a professorship.  Bayon Opp'n Mem. at 6.  He further notes that, while he was permitted to introduce "direct" evidence of such, he did not introduce any evidence of economic injury and argues that the entire jury award should be attributed to his emotional distress injury.[24]  *Ibid*.

---

[23] Awards for "future pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" are subject to the cap.  42 U.S.C. §1981a(3).

[24] The position is somewhat contrary to Bayon's trial testimony that he owes $100,000 in student loans and contrary to counsel's suggestion in his closing argument that the jury should award Bayon $100,000 for his student loans as well as an additional amount per year — perhaps $50,000 — to compensate for his emotional distress.  The verdict sheet did not contain separate categories of damages and the jury awarded only one amount — $601,000.  To the extent the jury intended to award Bayon damages for his $100,000 student loan debt, the Court concludes that such award is not supported by the evidence because Bayon did not prove, by a preponderance of the evidence that UB's retaliation *caused* him to incur such debt or that UB's retaliation *caused* his inability to repay it.

No evidence was presented at trial relative to the number of persons employed by UB, but UB concedes that it employs over 500 persons.[25]   Therefore, pursuant to 42 U.S.C. §1981a, the jury's award must be reduced  from $601,000 to $300,000.

UB further argues that the evidence is insufficient to justify even $300,000 in emotional distress damages and that the Court should reduce the award to no more than $20,000.  Remittitur is the "process by which the court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial."  *Earl* v. *Bouchard Trans. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990).  An award made pursuant to federal law is said to be excessive if it "shocks the judicial conscience."  *Ismail* v. *Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).  In determining whether a jury's award is so excessive as to shock the judicial conscience, courts have looked to "awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances."  *Scala* v. *Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993).  The Court concludes that even the reduced amount of $300,000 shocks the judicial conscience in light of the evidence presented, was likely the result of juror sympathy rather than a dispassionate review of the evidence and must be further reduced or a new trial ordered.

In considering an appropriate amount of damages, the Court looks to awards in similar cases.  The cases cited by Bayon in support of the award contain either

[25] UB's website indicates that, as of September 2005, it employs over 14,000 persons in full and part-time, graduate student and undergraduate student positions.

substantially more evidence of emotional distress or no analysis of the evidence presented.  For example, in *Phillips* v. *Bowen*, 278 F.3d 103, 111-112 (2d Cir. 2002), the Second Circuit upheld an award of $400,000 where the evidence, including testimony by the plaintiff, her boyfriend, co-workers and the defendants themselves, demonstrated continuing harassment over a 5-year period which resulted in plaintiff's daily crying, her feeling sick to her stomach to the extent that every night after work she would spend 2 to 3 hours in the bathroom, her inability to handle the pressure of dealing with her work supervisors and her reduced enjoyment of life to the extent that she no longer participated in recreational activities she once enjoyed. *Id*. at 108-109.  In *Hughes* v. *Patrolmen's Benevolent Ass'n of New York, Inc.*, 850 F.2d 876, 883 (2d Cir. 1988), the court upheld a substantial amount of damages awarded on the plaintiff's state law claim for intentional infliction of emotional distress but did not discuss the extent or the nature of the evidence of that plaintiff's emotional distress.  *Ibid*.  It is noteworthy, however, that a claim for intentional infliction of emotional distress will lie only where the defendant "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Ibid*.  Thus, liability is predicated on the demonstration of *severe* emotional distress. Finally in *New York City Transit Authority* v. *State Division of Human Rights*, 581 N.Y.S.2d 426 (2d Dep't 1992), the Court upheld an award of $400,000 for emotional distress arising from the Transit Authority's refusal to grant several medically-necessary requests for restricted duty to a pregnant employee who thereafter

miscarried one pregnancy and was forced to take unpaid leave for the duration of a subsequent pregnancy. *Id*. at 427-28. The Court found that the complainant had suffered anguish, guilt, depression and anger during and after each of the four separate discriminatory incidents and that such feelings continued from the time of the discrimination in 1981 until the time of the hearing in 1987 and 1988 and that such feelings would continue into the future. *Id*. at 429.[26]

In contrast, in *Reiter* v. *Metropolitan Transportation Authority of New York*, 2003 WL 22271223 (S.D.N.Y. 2003), the court reduced the jury's award of $140,000 to $10,000 where the evidence of the plaintiff's emotional distress consisted of the plaintiff's testimony that he felt "[n]ervous, anxious, tense [and] on edge." *Id*. at *5. Reiter also testified, however, that he had experienced no difficulty eating or sleeping and that he never saw a doctor regarding his distress. *Ibid*. Similarly, in *Kim* v. *Dial Service International Inc.*, 1997 WL 458783 (S.D.N.Y. 1997), the court reduced the jury's verdict from $300,000 to $25,000 in light of the plaintiff's evidence of distress which consisted of plaintiff's testimony that he felt "gloomy," had difficulty sleeping, and had lost 20 pounds as a result of diminished appetite. *Id*. at *14. That plaintiff's wife testified that the plaintiff no longer enjoyed socializing, had difficulty sleeping, took sedatives and drank. *Ibid*.

---

[26] The Court did not consider the cases Bayon cited that did not originate within the Second Circuit.

In another case, *Rainone* v. *Potter*, 388 F. Supp.2d 120, 122 (E.D.N.Y. 2005) the

district court noted a "range" of emotional distress awards from $5,000 to $35,000 for

"garden variety" distress, from $50,000 to $100,000 for "significant" or "substantial"

distress and of $100,000 and more for "egregious" cases. *Rainone*, at 122-23 (internal

citation omitted). The court adopted a definition of "garden variety" distress claims

as those "presented primarily through the testimony of the plaintiff, who describes

his or her distress in vague or conclusory terms and fails to describe the severity or

consequences of the injury." *Ibid*. After examining the evidence of Rainone's

emotional distress, which consisted of his own testimony, as well as his wife's and

his treating physician's, and included a description of symptoms of depressed mood,

difficulty concentrating, insomnia, lethargy, indecisiveness and low self-esteem, the

court remitted Rainone's damages award from $175,000 to $50,000. *Id*. at 127.

Similarly — and cited within *Rainone* — is the case of *Norville* v. *Staten Island

University Hospital*, No. 96-5222, Mem. & Order at 5-13 (E.D.N.Y. 2003), *aff'd*, 112

Fed.Appx. 92 (2d Cir. 2004), a disability discrimination case in which the plaintiff

presented evidence that, after her discriminatory discharge, she cried on a daily

basis, experienced panic attacks, had difficulty sleeping, suffered with a nervous

stomach and avoided her normal social activities. The plaintiff also visited a social

worker on one occasion and was diagnosed with clinical depression and post-

traumatic stress disorder. The plaintiff's distress was corroborated by her sister and

her social worker.  The *Norville* court reduced the jury's award of $575,000 to $30,000, which reduction was upheld on appeal.

Taken in the light most favorable to Bayon, the evidence established that Bayon was depressed, anxious, lethargic, suffered disruption in his sleeping patterns and engaged in binge eating.  Bayon did not testify that he required or sought any treatment for his distress.  Moreover, Bayon did not testify as to the duration of his distress.  Draper, on the other hand, testified that in the Fall of 2004 Bayon was prescribed anti-anxiety medication and that she took Bayon to the hospital for stomach pains, chest pains and other ailments which she attributed to his emotional distress.  However, the facts that Bayon testified that he had not sought medical treatment for his emotional distress, the absence of any evidence Bayon's physical ailments were attributable to his emotional distress, the absence of any testimony by Bayon that he has been prescribed any medication — coupled with the approximately 6-year lag between the time of the retaliation and the purported prescription — indicate that Draper's testimony concerning the alleged physical ailments and the alleged prescription should be accorded little weight.

Bayon's evidence of emotional distress is more akin to that introduced in *Reiter*, *Rainone* and *Norville*, as opposed to *Phillips* or *Transit Authority* and consequently remittitur is appropriate.  The Court must also note, however, that the Second Circuit has affirmed the award of $125,000 in emotional distress damages in an age discrimination case under the more exacting New York "deviates materially"

- 28 -

standard where the evidence supported a finding of "subjective distress" not accompanied by medical treatment.  *See Meacham* v. *Knolls Atomic Power Lab.*, 381 F.3d 56, 77-78 (2d Cir. 2004), *vacated on other grounds sub. nom. KAPL, Inc.* v. *Meacham*, – U.S. –, 125 S.Ct. 1731 (2005).   Therefore, the Court finds that the maximum sustainable award based on the evidence of emotional distress presented is $100,000.

Accordingly, it is hereby **ORDERED**  that UB's Motion for Judgment as a Matter of Law is denied and that its Motion for a New Trial will be granted as to emotional distress damages unless within thirty (30) days of the entry of this Memorandum and Order, Bayon agrees, in writing, to the reduction of his award to $100,000.

DATED:      Buffalo, N.Y.

April 13, 2006

_____
          */s/ John T. Elfvin*
          JOHN T. ELFVIN
          S.U.S.D.J.